**In the Matter Of:**

MARTINEZ vs MENESES

1:25-cv-3979

**CHRISTINE FRANCES MENESES**

*July 16, 2026*



800.211.DEPO (3376)
*EsquireSolutions.com*

CHRISTINE FRANCES MENESES                                July 16, 2026
MARTINEZ vs MENESES                                              1

UNITED STATES DISTRICT COURT

FOR COLORADO

IVON GONZALEZ MARTINEZ;              .
ADRIAN CUEVAS CASTRUITA;             .
MARTHA CELENE ARELLANO;              .
ALEXANDRA CASTRUITA ARELLANO;        .
and JESUS ARRENDONDO CALDERA,        .
                                     .
          Plaintiffs,                .Case No.: 1:25-cv-3979
                                     .
vs.                                  .
                                     .Denver, Colorado
FRANCES CHRISTINE MENESES; and       .July 16, 2026
MENESES LAW PLLC, a Texas            .9:11 a.m.
Professional Limited Liability       .
Company,                             .
                                     .
          Defendants,                .
. . . . . . . . . . . . . . . . . . .

VIDEOTAPED DEPOSITION OF

FRANCES CHRISTINE MENESES

Taken by the Plaintiffs

Matthew Tuffli
Digital Reporter
Notary Commission No. 20254011617



800.211.DEPO (3376)
EsquireSolutions.com

APPEARANCES OF COUNSEL

On Behalf of the Plaintiffs, Ivon Gonzalez Martinez, Adrian Cuevas Castruita, Martha Celene Arellano, Alexandra Castruita Arellano, and Jesus Arrendondo Caldera:

    BETH KLEIN, ESQ.
    BETH KLEIN, P.C.
    350 Market Street, Suite 310
    Basalt, Colorado 81621
    303-448-8884
    beth@bethklein.com

    SARAH LOGAN, ESQ.
    THE LOGAN FIRM, P.C.
    4150 Darley Avenue, Suite 6
    Boulder, Colorado 80305
    303-494-5209
    info@loganfirm.us

On Behalf of the Defendants, Frances Christine Meneses and Meneses Law, PLLC, a Texas Limited Liability Company:

    JOSEPH Y. AHMAD, ESQ.
    KYLE A. POELKER, ESQ.
    AZA LAW
    1221 McKinney Street, Suite 2500
    Houston, Texas 77010
    713-655-1101
    joeahmad@azalaw.com
    kpoelker@azalaw.com

    JOHN M. PALMERI, ESQ.
    ANDRES M. HERMOSILLO, ESQ.
    GORDON REES SCULLY MANSUKHANI, LLP
    555 17th Street, Suite 3400
    Denver, Colorado 80202
    303-534-5145
    jpalmeri@grsm.com
    ahermosillo@grsm.com

Also present:

    Tim Falk, Videographer
    Thomas Ganucheau, Esq. (Via  Zoom)
    Karina Sanchez-Peralta, Esq. (Via Zoom)
    Bilma Canales, Esq. (Via Zoom)



CHRISTINE FRANCES MENESES                          July 16, 2026
MARTINEZ vs MENESES                                         3

                    INDEX OF EXAMINATION

EXAMINATION                                              PAGE

Direct Examination by Ms. Klein                            7

                    INDEX OF EXHIBITS

PLAINTIFFS'             DESCRIPTION                      PAGE

Exhibit 3              Response                           120

Exhibit 17            Draft Declaration                  105

Exhibit 64            Consultation Notes                 124

Exhibit 65            Consulta for Adrian                106

Exhibit 75            Declaration                        115

        (Exhibits Attached to the Original Exhibit)



(The proceedings commenced at 9:11 a.m.)

THE VIDEOGRAPHER:  This begins video number one in the 30(b)(6) deposition for Meneses Law, PLLC in the matter of Ivon Gonzalez Martinez, et al.  Versus Frances Christine Meneses, et al.  Apologies if I mispronounced that.  Case Number 1:25-cv-3979 in the United States District Court for Colorado.

We are on the record at 9:11 a.m. on Thursday, July 16th, 2026.  This deposition is being held at 555 17th Street, Suite 3400, Denver, Colorado.

The videographer is Tim Falk and the court reporter is Matt Tuffli representing Esquire Deposition Solutions.

Would counsel identify yourself and state whom you represent, please?

MS. KLEIN:  Beth Klein for all the plaintiffs.

MS. LOGAN:  Sarah Logan for all the plaintiffs.

MR. AHMAD:  Joe Ahmad and Kyle Poelker for the defendants.

MR. PALMERI:  John Palmeri and Andres Hermosillo, also for the defendants.

MS. KLEIN:  Do you need the people on the Zoom?

THE REPORTER:  Yes, everybody in the room.



MS. KLEIN:  In the room or on the Zoom?

THE REPORTER:  Both.

MR. GANUCHEAU:  On the Zoom, Thomas Ganucheau. I represent Meneses.

MS. SANCHEZ-PERALTA:  On the Zoom, Karina Sanchez-Peralta.  I represent Meneses.

MS. CANALES:  Bilma Canales on the Zoom.  I represent the Plaintiff, Christine Meneses as ethics counsel.

THE VIDEOGRAPHER:  Is that everybody?

THE REPORTER:  Kyle?

MR. POELKER:  Oh, he announced for me.

THE REPORTER:  Oh, you did.

THE VIDEOGRAPHER:  Okay.  Would the court reporter please swear in the witness?

THE REPORTER:  My name is Matthew Tuffli, Notary Public and Digital Reporter in the State of Colorado.  The witness is located in Denver, Colorado and confirmed her identity with the Texas state issued driver's license.

Pursuant to the Colorado Rules of Civil Procedure 30(b)(2), I will be capturing the verbatim record of today's proceeding, using electronic audio equipment, a computer, and specialized recording software, which is not a form of stenography.



Absent any objection at this time, counsel and the witness agree to my administration of the oath to this witness.  The final transcript may be used for all purposes allowed by the Colorado Rules of Civil Procedure.

Hearing no objection, this shall constitute agreement and stipulation of such.  And I will now swear in the witness.

MR. AHMAD:  Let's be clear.  We're in federal court.  This is under the Federal Rules of Civil Procedure, not the Colorado Federal Rules of Civil Procedure so.

MS. KLEIN:  It's the Federal Rules of Civil Procedure.

MR. AHMAD:  I don't --

THE REPORTER:  Okay.  I have a jurisdiction in Colorado.

MR. AHMAD:  To the extent they are different, I just want to make sure that we all understand that this is pending in federal court and we're going to abide by the federal rules.

THE REPORTER:  Okay.  You stipulate on the record that we're abiding by the federal rules, Counsel?

MS. KLEIN:  Yeah.

THE REPORTER:  Yes.  Thank you.  Counsel, you



may proceed.

MS. KLEIN:  Do you need to do a videographer --

THE VIDEOGRAPHER:  We're good.

MS. KLEIN:  Okay.  Great.

FRANCES CHRISTINE MENESES

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. KLEIN:

Q.   Good morning.

A.   Good morning.

Q.   Please state your name.

A.   Frances Christine Meneses.

Q.   Good morning, Ms. Meneses.  How would you prefer me to address you, Mrs. Meneses or Ms. Meneses or Christine?

A.   Ms. Meneses.

Q.   Thank you.  What did you do to prepare for your deposition other than the substance of what you discussed with your counsel?

A.   I reviewed all the exhibits in front of me. I've spoken to some people in our office and reviewed all the evidence that was on the case.

Q.   Got it.  How many hours did you put in to prepare yourself for the deposition today?



A.    I'm not sure.

Q.    Like 40?

A.    I would be speculating.

Q.    Okay.  Did you spend more than a day?

A.    Yes.

Q.    Okay.  I would like to know when did you create Meneses Law, PLLC?

A.    I don't remember the exact date, but I believe it was in -- it was in 2021.

Q.    And how did you get the idea for this law firm?

A.    There was a need.

Q.    And is immigration law your passion?

A.    Yes.

Q.    And why is it your passion?

A.    Because I'm able to help people.

Q.    And I'm seeing like you're being moved at the moment.  You're being -- like your heart is really into doing this work, isn't it?

A.    It is.

Q.    Yeah.  How many people have you helped?

A.    I wouldn't know.  I'd be speculating.

Q.    More than a thousand?

A.    Again, I wouldn't know.  I'd be speculating.

Q.    How many people have you represented?



CHRISTINE FRANCES MENESES                              July 16, 2026
MARTINEZ vs MENESES                                              9

A.    I don't have that number.

Q.    Can you give me an estimate?

A.    I'm not going to speculate.

Q.    I'm just asking for an estimate.

A.    I don't -- I don't have an estimate.

Q.    Do you have any system in place where you could refresh your recollection on how many people you've represented?

A.    Mm, not -- we do have a system in place, but again, it would depend on whether I represented or who represented in the firm.

Q.    How about within the -- the firm as a whole? You're the sole member of the firm, right?

A.    I am the sole owner of the firm.

Q.    Yeah.  And do you have a board?

A.    No.

Q.    You're -- you're it?

A.    Yes.

Q.    Okay, great.  So if you wanted to go back and determine how many clients your law firm has represented, how would you do that?

A.    I'm not sure.

Q.    Okay.  Do you have any sort of numbers on how many clients you represent on an annual basis?

A.    Currently, no.



Q.    No?

A.    Mm-mm.

Q.    Do you have anyone who is responsible for the -- the finances of the -- the company or is it you?

A.    There's somebody responsible, yes.

Q.    Okay.  Would they have numbers on how many fee -- fee contracts that you've entered into?

A.    They may have numbers of the finances.

Q.    Okay.  Who would have -- who would be able to figure out how many fee agreements you've entered into?

A.    I wouldn't know.

Q.    Okay.  Who would know?

A.    It's not work that we do in our office.

Q.    Pardon?

A.    That's not work that we do in our office.

Q.    You don't keep track of how many contracts you've entered into?

A.    Mm -- it's not part of our -- our job.

Q.    I'm -- I'm talking particularly about fee agreements.

A.    It's not something we track.

Q.    Okay.  Do you have a system, a database that has the client -- the client files all separated out?

A.    Yes.

Q.    And how would -- would you be able to count



the number of client files that you have?

A.    No.

Q.    No?

A.    Mm-mm.

Q.    Would somebody else be able to count the number of files?

A.    I mean, they would be able to count active files, but -- no.

Q.    Okay.  Do you know how many active files you have?

A.    I don't know that.

Q.    Okay.  How would we find that out, information out?

A.    I wouldn't know.

Q.    You wouldn't know --

A.    Mm-mm.

Q.    -- as the sole owner of your company, how to figure out how many active files you have open?

A.    No.

Q.    Who would have that ability?

A.    I wouldn't know that answer either.

Q.    Who would have an answer to that question?

A.    I don't know.

Q.    Okay.  So as a lawyer in a law firm that you own by yourself, you have no way of understand -- of



CHRISTINE FRANCES MENESES                          July 16, 2026
MARTINEZ vs MENESES                                          12

knowing the number of how many open files you have?

A.    I don't understand what that premise.    I didn't say there's no way.    It's just we don't track that currently.

Q.    Well, how would you -- how would you go about it?

A.    I would have to do research and figure it out.

Q.    Okay.    How many VAWA filings do you do a day?

A.    None.

Q.    You don't do any VAWA filings yourself?

A.    Not anymore.

MR. AHMAD:    If I may, is this -- is this in relation to a corporate rep topic?

MS. KLEIN:    Yeah.    We're trying to figure out how many -- how her business is structured, how many clients she's serving.

MR. AHMAD:    And which -- which topic is -- is this concerning?

MS. KLEIN:    Management and organizational start -- management structures 2001 to the present, VAWA intake questions and procedures, policies, drafting, client communications, file management.

MR. AHMAD:    I don't know that the number of VAWA clients falls within that topic.    That's the issue.

MS. KLEIN:    All right.



CHRISTINE FRANCES MENESES                                July 16, 2026
MARTINEZ vs MENESES                                            13

            MR. AHMAD:  I don't --

            MS. KLEIN:  Client files and work performed --

            MR. AHMAD:  So the problem is.

            MS. KLEIN:  We have volume.

            MR. AHMAD:  So hang on.  The problem is, is
that you're asking her a lot of questions that are not
contained in a corporate rep topic.  I'm happy to
attempt to get that information.

            MS. KLEIN:  Sounds great.  Let's end the
conversation right there.  Thank you for agreeing to do
that.

BY MS. KLEIN:

     Q.   Tell me, who is in management in your company?

     A.   I would have to take a look at the binder.  So
we currently have a CFO.  We have a director of sales
and communications.  We have an operations director.  We
have an HR manager.  We have a sales manager.  We have a
marketing director, marketing manager, a customer
service manager.  We have managers in every office, and
we have an attorney, a supervising attorney.

     Q.   Got it.  And what are you looking at?

     A.   It is the organizational chart in our website.

     Q.   Okay.  So your organizational chart is on the
website as it currently exists as of today?

     A.   There might be some edits needed, but there is



some -- some of the management members on there.

Q.   And so are there any other managers in your company other than the people listed on your website as managers?

A.   There's a possibility that there are.

Q.   I -- I want to be clear because I don't want to cross a line with managers.  Is there anybody else that you can think of that's not identified on your website as a manager?

A.   There's a possibility that there could be, yes.

Q.   Okay.  It's a big company, isn't it?

A.   Define big.

Q.   Well, you define it.

A.   You're asking the question.

Q.   All right.  Do -- does the website identify the divisions and management -- management structure for your company?

A.   It lists out the members, some of the members, yes.

Q.   Does it list out their responsibilities?

A.   I'm not sure about that.

Q.   Does it list off like what they're responsible for?

A.   It lists out their job title.



Q.   Okay, great.  And does the job title -- is there a place where job titles have definitions?

A.   When you say place, what do you mean?

Q.   Any like a document or a web page or -- I -- I don't know where you store your information.  So I'm trying to figure out, is there any documentation in your company about what each of these individuals' responsibilities are?

A.   There is a job description.

Q.   And where are those?

A.   Stored on a system, I guess.

Q.   Okay.  Would you be able to get those?

A.   Yes.

Q.   Great.  Thank you.  We have a list of people, I think, that we pulled off of your website and some other additional people that we've identified in the files.  And this is topic B, I think, in the notice.

Do you have that in front of you?

A.   Yes.

Q.   Great.  Looking down this list of roles and responsibility of named individuals, can you just run quickly down and let me know who are the managers listed on that list as opposed to just a general employee?

A.   I believe this document is self-explanatory.

Q.   Well, I just need you to confirm for me.  I



want -- it's -- if you wouldn't mind.

A.   You have myself as the principal.  You have Julio Meneses.  That -- that name is incorrectly listed out.

Q.   What is the correct name, please?

A.   Julio Meneses.

Q.   Okay.  Carlos is not part of the name?

A.   No.

Q.   Is that JC?

A.   Yes.

Q.   Okay.  What does the C stand for?

A.   I am not aware of what the JC stands for.

Q.   Okay.  Go ahead.  Keep going.

A.   Can you repeat the question again?

Q.   Sure.  Running down this list, let's just walk down this list and figure out who's in -- who you consider a manager.

A.   We have Todd Henson, which is supervising attorney.  This is also listed on the page that I mentioned on the website.  We have Maribel Rueda, who is the CFO, the Chief Financial Officer.

We have Pamela Anzaldua, which is the Senior Director of Sales and Communication.  We have Sylvia Alarcon, who is the Operations Director.  We have Erika Garcia, who's the Sales Manager.



CHRISTINE FRANCES MENESES                                    July 16, 2026
MARTINEZ vs MENESES                                                      17

We have Guadalupe Vega, who is the Marketing Manager.  We also have Adriana Rodriguez, who is the Customer Service Manager.  And that's all that's listed on here that are managers.

Q.   Okay.  And then the rest of the managers that aren't on this list are on the website, correct?

A.   They might not be on the website.

Q.   Okay.  I want to focus in on Erika Garcia, your Sales Manager.  Is she -- would she be keeping track of numbers of intakes that you have?

A.   Possibly.

Q.   Okay.  Does she have any kind of fee structure that's tied into the level of sales she's able to achieve?

A.   What do you mean fee structure?

Q.   In other words, does she get extra compensation for selling more fee agreements?

A.   I would not agree with that premise.

Q.   Okay.  Is she compensated in any way that's tied to productivity?

A.   Yes.

Q.   And can you tell me about that?

A.   If she -- if there is performance, they get a bonus.  They get -- they get a bonus, but it's not the only metric.



Q.   Of course.  What are the other metrics?

A.   HR behavior, accuracy of their work, showing up on time, general employee.

Q.   Sure.

A.   Normalities.

Q.   Of course.  Sylvia Alarcon?

A.   Yes.

Q.   She's Operations Director.  Does she oversee all of your offices or is she in a specific division at this point?

A.   She oversees all of the offices.

Q.   Okay.  And where is she located?

A.   Houston.

Q.   And she's management, correct?

A.   Yes.

Q.   Okay.  What are her duties and responsibilities?

A.   I don't have the direct list in front of me. So I'd be speculating a little bit, but it requires ensuring that the team is helping the legal team, the attorneys, ensuring that the office is operating as needed.  Ensuring that it -- that the staff know what to do and communicating with -- with the lawyers.

Q.   Okay.  And does she handle the Broomfield office as well?



CHRISTINE FRANCES MENESES                           July 16, 2026
MARTINEZ vs MENESES                                           19

A.    She handles all the offices.

Q.    All of it.  And does she have a manager that's below her in the Broomfield office?

A.    Yes.

Q.    And who is that person?

A.    I don't know who that person is.

Q.    Okay.  Guadalupe Vega, Marketing Manager?

A.    Mm-hmm.

Q.    Does she take care of all of your marketing efforts for your company?

A.    She's involved in ensuring all the --yes.  She -- she works on the marketing efforts.

Q.    Is she like the point person for marketing and marketing success programs?

A.    There is a Marketing Director.

Q.    Who's the Marketing Director?

A.    His name is Ivan Escalante.

Q.    Could you please spell that for me?  Maybe not --

A.    I'd be speculating.

Q.    Is it on the website?

A.    I don't think it is.

Q.    Ivan.  Give us your best shot.

A.    E-S-C-A-N-T-E.

Q.    Thank you very much.  Is he in Houston?



CHRISTINE FRANCES MENESES                              July 16, 2026
MARTINEZ vs MENESES                                         20

A.   Yes.

Q.   And he's the -- your major point person for marketing success, correct?

A.   Define success.

Q.   Well, what -- what do you think is successful marketing --

A.   You're asking the question.

Q.   I'm -- and I'm asking the follow-up question. What do you -- what do you consider a successful marketing person to be?

A.   Again, what do you define success?  You're asking the question.  In order for me to answer that fully, you're going to have to define what you mean successful, so I can see if I can answer that.

Q.   Oh, okay.  Well, if you're going to hire a marketing point person, how would you want them to be -- how would you want them to prove that they're successful?

A.   It depends on their resume.

Q.   Okay.

A.   I'm not the one that hires, so it would depend on -- on -- on that resume.

Q.   Who's the point person for hiring?

A.   There's an HR manager for that.

Q.   And who is that?



A.    Sandra Johnson.

Q.    When you go to review Ivan Escante for his success, what do you look for?

A.    Again, what do you mean success?

Q.    I'm asking you.

MR. AHMAD:  Hang on for a second.  Do you mind if we take just a two minute break?  I mean, I won't do it unless --

MS. KLEIN:  I really don't.  I really want to get through this in seven hours.  If you really want to --

MR. AHMAD:  Well, it won't count on your time if we take a break.

MS. KLEIN:  Yeah.

MR. AHMAD:  And it would -- and it would -- it would be designed to speeding this up, but I won't do it if you don't want me to.

MS. KLEIN:  Let's just not.  Let's just keep forging ahead.

BY MS. KLEIN:

Q.    In the role of marketing director, what are Ivan Escalante's measurements for job performance?

A.    I don't have that in front of me, but --

Q.    Where would we find that?

A.    Again, I would have to go look.



Q.    Would you -- would you talk to Sandra?

A.    Possibly.

Q.    Okay.  Diane Alfonso, is she the primary interpreter in your office or is she one of many?

A.    She's one of several.

Q.    Okay.  Who are the interpreters in your office?

A.    I wouldn't have those names off the top of my head.

Q.    Who would have those names?

A.    I would have to look that up.

Q.    Where would you look it up at?

A.    Probably in a directory roster or with HR.

Q.    Do you have an employee directory?

A.    Not necessarily, but I can -- there are things that we can go look.

Q.    Do you have an employee roster?

A.    We have a system where we keep our employees, yes.

Q.    Yeah.  What's that system?

A.    ADP.

Q.    Thanks.  Do you -- do you have a list of all the intake personnel that take the original calls from potential clients?

A.    Prob -- again, like I mentioned, possibly we



CHRISTINE FRANCES MENESES                                    July 16, 2026
MARTINEZ vs MENESES                                                    23

can go look that up.

Q.    Okay, great.  Do you have -- do you have a specific group of people who write declarations for VAWA clients?

A.    Yes.

Q.    And do you have a list of their names?

A.    Possibly look that up in ADP as well.

Q.    Okay, great.  Would you do that?

A.    I'm sorry, what was --

Q.    Would you do that?

MR. AHMAD:  Hang on.  Hang on.  I offered to take a break, okay?  And help you out and make this more, you know, efficient, okay?

MS. KLEIN:  I like the testimony as it's coming in, so --

MR. AHMAD:  I understand, but, you know, if you're going to continue to ask these questions, which I don't -- I'm not even sure are called for in the corporate rep topics, then we're going to take a break.

Otherwise, you know, I'll just have to start objecting because these are not topics.  These are not questions that are geared in my mind to any specific topic.

BY MS. KLEIN:

Q.    What are the roles and responsibilities of the



people who write declarations for VAWA claims?

MR. AHMAD:  Hang on.  Is that anywhere in the corporate rep --

MS. KLEIN:  It says B, roles and responsibilities, and then it lists firm's creative writers, which --

MR. AHMAD:  Okay.  Creative writers?

MS. KLEIN:  Yeah.

MR. AHMAD:  Okay.  Well, without more clarity -- and like I said, I am more than happy to take a break and attempt to find out some of this stuff, but you're springing questions that I don't believe are anticipated by the topics.

BY MS. KLEIN:

Q.   Do you have offshore employees?

A.   No.

Q.   Are all your offshore employees independent contractors?

A.   Yes.

Q.   Do offshore employees work on VAWA claims?

A.   Define by work.

Q.   Do they perform any services in preparing VAWA applications?

A.   They help administratively.

Q.   And what does that mean?



A.    Phone calls, taking notes, filing.

Q.    How many -- where are the offshore offices located?

A.    I'm sorry.  What was that question?

Q.    Yeah.  Where are the offshore offices located?

A.    There are none.

Q.    Have there been in the past?

A.    No.

Q.    There are no offices offshore, just independent contractors, individual people?

MR. AHMAD:  Objection, form.

BY MS. KLEIN:

Q.    Why don't you describe to me how the offshore operations work?

MR. AHMAD:  Hang on.  I'm going to object as form and specifically, asked and answered, but you can go ahead.

THE WITNESS:  Repeat the question.

MS. KLEIN:  Would you read it back to her, please?  Thanks.  If you can.

THE REPORTER:  Give me one second.

(The reporter read back the requested portion.)

MS. KLEIN:  Describe.

MR. AHMAD:  Describe what?



MS. KLEIN:  I'm -- I'm talking to the reporter so he can find the question.

THE REPORTER:  That was not it?

MS. KLEIN:  Describe.  All right.  Let me try again.  We'll just go.

BY MS. KLEIN:

Q.   Would you please describe the structure of the offshore operations for your law firm?

MR. AHMAD:  Objection, form.

THE WITNESS:  There is no back office.  I had already answered that and --

BY MS. KLEIN:

Q.   Back office?

A.   You said back office or office --

Q.   I said offshore.

A.   Offshore office.  There is no offshore office.

Q.   When you just told me before that there was offshore offices for phone calls, notes and files, did you hear me say back office?  I was saying offshore.

A.   Offshore office, whatever you want to describe it, there is none.

Q.   Was there in the past?

A.   No.

Q.   Is there any operations in Bogota?

A.   No.



Q.   Are all of the people who work on client files for your law firm, are they all located in the United States?

A.   Again, I have mentioned there's independent contractors.  So --

Q.   I'm sorry.  I'm --

A.   There's administrative staff --

Q.   Mm-hmm.

A.   -- that we talked about, the independent contractors you mentioned.

Q.   Mm-hmm.

A.   Yes, there's that.

Q.   They are in the United States?

A.   Yeah.  We have people in the United States as well.

Q.   All right.  I think we're cross-purposing, but -- so you said you have administrative offices.

A.   In Houston --

Q.   Are they offshore?

A.   In Houston, in the U.S.  No, they're not offshore.

Q.   Okay.  Are all the people who work on files for clients in your law firm, are they all in the United States?

A.   They're in the United States.  Not all, but



there's, again, like -- like I mentioned, there are people who are outside of the United States.

Q.   Okay.  And where are they located?

A.   I would not know that.  I would have to check.

Q.   Are they just remote workers?

A.   They're remote independent contractors.

Q.   Okay.  Do you know if any remote independent contractors worked on any of my clients' files?

A.   I would have to take a look at the notes of those cases for each independent client.

Q.   Is there something I can provide for you --

A.   I have it.

Q.   You have it?  Great.

A.   So on the notes generated from my case, there are listed some people.  It seems like there might be a few people here listed that are independent contractors.

Q.   Okay.

A.   Mm-hmm.

Q.   Do you have a particular client file from your MyCase printout in front of you?

A.   I have the MyCase notes that were provided, yes.

Q.   And which client are you talking --

A.   I am currently looking at Adrian Cuevas Castruita.



Q. And can you identify the independent contractors on that case -- MyCase?

A. It would be difficult. I'd be speculating because I would have to go look and find out who -- who is listed on here and the full name, and if they're an independent contractor or not.

Q. Okay. Do you know who wrote the declaration for Adrian?

A. No, I don't.

Q. Did you use AI to write that declaration?

A. No.

Q. So somebody physically wrote that document?

A. Yes.

Q. Do you know when you sent a copy of that to Adrian?

A. I don't have that information, no.

Q. Looking at all the emails and all of the text messages and the entire client file, are you able to tell me what day you sent the declaration to Adrian?

A. I wouldn't know whether it was sent, but I can tell you a date where possibly he was -- he was -- he reviewed everything.

Q. And how would he have reviewed it?

A. It could have been over a phone call. It could have been sent to him. It could have been mailed



to him.  I'm not quite sure which method was done in this case.

Q.  All right.  How would you determine whether the declaration was ever sent to him in any way?

A.  There's no way for me to determine that.

Q.  Okay.  How -- how was his signature obtained for that declaration?

A.  The client provided it.

Q.  And how did he do that?

A.  I'm not quite sure what were the exact events of the -- of his case when it happened, but he was -- he must have provided it because generally speaking in our office, that's the way it would have worked.

Q.  How -- you did not have an office in Colorado when you were working on Adrian's case, correct?

A.  No.

Q.  And you didn't have an office in Colorado when you were working on Jesus's case, correct?

A.  I'm not sure.  I would have to look at the dates.

Q.  When did you open your office in Colorado?

A.  November of 2025.  I don't remember the exact day, but November of 2025.

Q.  You've been terminated from Jesus's case by that time, correct?



A.    I believe so, yes.

Q.    And you did not have an office open in Colorado during the time that you were representing Martha Celene?

A.    No.

Q.    Okay.  So everything that would have been done with them would have had to have been done electronically, correct?

A.    Correct.  Like -- well, it could have done -- been done electronically, as well as different other means as well.

Q.    Okay.  Tell me -- tell me the other means.

A.    It could have been --

Q.    Do you have any evidence --

A.    It could have been discussed over the phone as well.

Q.    Okay.  But you can't do a signature in a discussion over the phone, correct?

A.    He can authorize.

Q.    Are you saying that all of the clients authorized their signature to be applied?

A.    No.  I didn't -- I didn't say that.

Q.    Do you have any evidence that Jesus authorized you to sign his declaration?

A.    Jesus was not completed.  So Jesus's case was



not submitted.

Q.   Jesus never received a copy of that declaration until this litigation, correct?

A.   Jesus's case was still being worked on.  So a declaration was never finalized on his case.

Q.   Okay.  When -- when did you send a copy of the declaration to Jesus?

A.   It was not sent because he terminated before we did that.

Q.   Yeah.  So if Jesus had testified that he got a copy of that declaration, he'd just be wrong, correct?

A.   Correct.

Q.   Do you -- do you know who had a conversation with Martha Celene authorizing the application and her signature to the declaration?

A.   I don't know if that was what they did in that case.  I don't know if they asked for an authorization of the signature in her case.

Q.   Do you know if she ever saw the declaration?

A.   I can't tell you that.

Q.   Either way, did or didn't, you don't know?

A.   There's a likelihood that she knew the content of that declaration, for sure.  That -- we -- generally, that's what would've happened.  She would've known exactly the content of that.  Whether it was read to



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com